1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   CHRISTOPHER GARCIA,                          No.  2:12-cv-01993-KJM-AC

12              Petitioner,

13        v.                                      FINDINGS AND RECOMMENDATIONS

14   M. BITER,

15              Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for attempted murder and related

19   gang enhancements.  ECF No. 1.  Respondent has answered, ECF No. 10, and petitioner has filed

20   a traverse, ECF No. 17.

21        For the reasons that follow, the undersigned recommends that the petition be denied on the

22   merits without an evidentiary hearing.

23                                    BACKGROUND

24        Trial Court Proceedings

25        Petitioner was charged with shooting at an occupied vehicle and two counts of attempted

26   murder.  Gang and gun enhancements were also alleged.  I C.T. 238-41.[1]  The facts underlying

27

_____

28   [1]  "C.T." refers to the Clerk's Transcripts lodged by the respondent in the instant case.  The
     (continued…)

1    these charges stemmed from two incidents that both occurred on February 24, 2007 in

2    Sacramento: a shooting at Sim Park and a shooting on Elder Creek Road.  Petitioner and co-

3    defendant Joseph Bustos were tried together to separate juries.  I C.T. 243.  The evidence at trial

4    established the following facts.

5         On February 24, 2007, Sureño gang members Jose Rivera-Quintero and Jonathon Sanchez

6    drove up to a residence inhabited by petitioner, his pregnant girlfriend, Christina Hamilton, and

7    her mother.  I R.T. 52-53, 107, 109-111, 134; II R.T. 299, 312.[2]  Petitioner was outside the

8    residence with his girlfriend, co-defendant Joseph Bustos, and a few others.  I R.T. 220; II R.T.

9    310.  The Sureños fired shots at the residence, injuring petitioner's girlfriend, and drove away in a

10   dark-colored van.  I R.T. 221, 256, 259-60; II R.T. 312-14.  The Sureños fired at the residence

11   because they believed that petitioner and Bustos, who were Norteño gang members, had shot their

12   friend Luis Martinez at Sim Park earlier that day.[3]  I R.T. 109-111, 118, 257, 276.

13        While petitioner's girlfriend was driven to the hospital by her brother, II R.T. 314,

14   petitioner and Bustos got into Bustos' white car and followed the van.  I R.T. 111, 258; II R.T.

15   378-79; III R.T. 672.  As Bustos drove the car, petitioner fired shots at the van.  I R.T. 113-14; II

16   R.T. 378-79; III R.T. 674-77.  Rivera-Quintero, the driver of the van, ducked to avoid the bullets

17   and crashed the van into a utility or telephone pole on Elder Creek Road.  I R.T. 102, 282; II R.T.

18   341, 379-80.  One shot hit Sanchez, injuring him.  I R.T. 274, 290-91; II R.T. 348-49.  Both

19   occupants of the van fled on foot as petitioner fired additional shots.  I R.T. 114, 164-65, 177,

20   258; II R.T. 380.

21        According to witnesses, the individuals from the white car rummaged around in the van

22   and appeared to remove something, which they put into the white car.  I R.T. 167-68, 178, 199; II

23   R.T. 352.  When petitioner returned to his residence, he handed some papers to his girlfriend's

24   _____

25   number preceding "C.T." refers to the specific volume.
     [2] "R.T." refers to the reporter's transcripts filed by respondent.  The number preceding "R.T."
26   refers to the specific volume.
     [3] Petitioner and Bustos were charged with the attempted murder of Luis Martinez, I C.T. 238, but
27   petitioner's jury was unable to reach a verdict and the court declared a mistrial as to this charge,
     IV R.T. 1002, 1004.  The Bustos jury acquitted Bustos of the charge.  IV R.T. 988.

28

2

1    mother and said, "[T]his is the guy who shot your daughter."  II R.T. 303.[4]

2        Rivera-Quintero and Sanchez, who plead guilty to the attempted murder of petitioner's

3    girlfriend, testified at petitioner's trial, but claimed not to recall any of the events.  I R.T. 58-59,

4    135-37, 147.

5        At trial, Detective Donald Schumacher testified as an expert on criminal street gangs.  II

6    R.T. 409, 421, 423.  Schumacher specializes in Hispanic gangs and is familiar with both the

7    Norteño and Sureño criminal street gangs, which are traditionally enemies.  II R.T. 412-13, 417.

8    Based on his training and experience, and various items found at petitioner's and Bustos'

9    residences, Schumacher opined that both petitioner and Bustos were active members of the

10   Norteño gang at the time of the incident.  II R.T. 426-27, 443, 447-48.  In Schumacher's opinion,

11   the shooting at Sim Park was committed for the benefit of the Norteño gang; the drive-by

12   shooting at petitioner's house was committed for the benefit of the Sureño gang in retaliation for

13   the shooting at the park; and the subsequent shooting committed by petitioner and Bustos was for

14   the benefit of the Norteño gang in retaliation for the drive-by shooting at petitioner's house.  II

15   R.T. 448, 454, 456-59.

16       Petitioner testified at trial and admitted that he has a Norteño tattoo and used to associate

17   with the Norteño gang.  III R.T. 695, 666-67.  However, he stopped association with gang

18   members when he found out that his girlfriend was pregnant.  III R.T. 667-68.  He denied ever

19   committing any type of criminal conduct that was gang-related.  III R.T. 658.  Petitioner also

20   denied being at Sim Park on the day Luis Martinez was shot.  III R.T. 690-91.  He testified that

21   after his girlfriend was shot outside his residence, he and Bustos chased the van in order to

22   identify the shooters and get their license plate number.  III R.T. 672, 674, 692, 789.  Petitioner

23   only shot at the van after its occupants repeatedly shot at him.  III R.T. 673-76, 736, 738-42, 753-

24   54, 775.  According to his testimony, he was scared and thought they were trying to kill him.  III

25   R.T. 676.  He was not acting for the benefit of the gang.  III R.T. 691.

26       On May 20, 2009, the jury found petitioner guilty of discharging a firearm at an occupied

27   _____

     [4] Petitioner testified that he and Bustos had taken the papers from the van.  III R.T. 684.

28

3

vehicle and the attempted murder of Jonathan Sanchez and Jose Rivera-Quintero.  IV R.T. 995, 998, 1000.  The jury found that both crimes were committed for the benefit of the Norteño criminal street gang,[5] and that petitioner had intentionally discharged a firearm, proximately causing great bodily injury to a person other than an accomplice.  IV R.T. 998-1001.  As to the attempted murder of Luis Martinez, the foreperson informed the court that the jury was hopelessly deadlocked.  IV R.T. 1002.  The court declared a mistrial as to this count, R.T. 1004, and subsequently granted the prosecutor's motion to dismiss the charge, IV R.T. 1027.  Petitioner was sentenced to an aggregate term of 40 years to life in prison.  IV R.T. 1022.

Direct Appeal

Petitioner timely appealed, and the California Court of Appeal for the Third Appellate District affirmed the conviction in an unpublished opinion dated May 27, 2010.  Lodged Doc. No. 6.  The California Supreme Court denied review on August 11, 2010.  Lodged Doc No. 8.

State Habeas Proceedings

Petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court on July 27, 2011.  Lodged Doc. No. 9.  The petition, which raised two claims not previously raised on direct appeal, was denied in a written order filed on September 20, 2011.  Lodged Doc. No. 10.  Petitioner then filed a habeas petition in the California Court of Appeal for the Third Appellate District, Lodged Doc. No. 11, which was summarily denied on December 1, 2011, Lodged Doc. No. 12.  On January 23, 2012, petitioner filed a habeas petition in the California Supreme Court, which was denied without comment or citation on May 9, 2012.  Lodged Doc. No. 14.

Federal Habeas Proceedings

The instant federal habeas petition was filed on July 30, 2012.  ECF No. 1.  It includes three claims: (1) insufficiency of the evidence to support the attempted murder conviction and the gang enhancements; (2) due process violation for failure to bifurcate the gang enhancements; and (3) ineffective assistance of trial and appellate counsel for failure to challenge the sufficiency of

---

[5]  The Bustos jury found the gang enhancements to be not true as to Bustos.  IV R.T. 989-90.

1   the evidence regarding the attempted murder conviction and the related gang enhancements.  ECF

2   No. 1 at 4-5.

3   STANDARDS GOVERNING HABEAS RELIEF UNDER THE ADEPA

4   28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

5   1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a state court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

13   The statute applies whenever the state court has denied a federal claim on its merits,

14   whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

15   (2011).  State court rejection of a federal claim will be presumed to have been on the merits

16   absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

17   Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

18   unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

19   "The presumption may be overcome when there is reason to think some other explanation for the

20   state court's decision is more likely."  Id. at 785.

21   The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

22   principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

23   U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

24   standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

25   (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

26   may constitute "clearly established Federal law," but circuit law has persuasive value regarding

27   what law is "clearly established" and what constitutes "unreasonable application" of that law.

28   Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

1   1057 (9th Cir. 2004).

2      A state court decision is "contrary to" clearly established federal law if the decision

3   "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

4   U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

5   court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

6   the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

7   was incorrect in the view of the federal habeas court; the state court decision must be objectively

8   unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

9      Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

10  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

11  reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

12  focus of the § 2254(d) inquiry is "on what a state court knew and did."  Id. at 1399.  Where the

13  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

14  state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

15  Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

16  without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

17  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

18  determine what arguments or theories may have supported the state court's decision, and subject

19  those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

20                     PETITIONER'S CLAIMS FOR RELIEF

21  I.      Claim One: Sufficiency of the Evidence

22          A.  Procedural Default

23      In Claim One, petitioner alleges that his constitutional rights were violated because there

24  was insufficient evidence to support his attempted murder conviction and the related gang

25  enhancements.  See ECF No. 1 at 4; Lodged Doc. No. 9 at 11.  This claim was raised for the first

26  time in state habeas proceedings.  The Sacramento Superior Court denied the sufficiency

27  challenge, stating as follows:

28

                                        6

1
2
3
4

> Petitioner challenges a 2009 conviction on grounds that the evidence was insufficient to support his conviction for attempted murder and gang enhancements. . . . First, habeas corpus cannot be used to retry issues, facts or the merits of a defense, including the question of whether the evidence was sufficient to warrant conviction. (*In re Lindley* (1947) 29 Cal.2d 709, 723.) Petitioner, therefore, may not directly challenge the evidence in this habeas.

5  Lodged Doc. No. 10 at 1.

6      In his answer, respondent contends that petitioner's claims challenging the sufficiency of

7  the evidence are procedurally defaulted because the state superior court held, with a citation to

8  <u>Lindley</u>, that habeas corpus "is not a proper vehicle for challenging the sufficiency of the

9  evidence." ECF No. 10 at 12-13.  As a general rule, a federal habeas court "will not review a

10  question of federal law decided by a state court if the decision of that court rests on a state law

11  ground that is independent of the federal question and adequate to support the judgment."

12  <u>Calderon v. United States District Court (Bean)</u>, 96 F.3d 1126, 1129 (9th Cir.1996) (citing

13  <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)); <u>cert. denied</u>, 520 U.S. 1204 (1997).  The

14  Ninth Circuit has held that the <u>Lindley</u> rule is an independent and adequate state procedural bar

15  that supports default.  <u>Carter v. Giurbino</u>, 385 F.3d 1194, 1996 (9th Cir. 2004), <u>cert. denied</u>, 543

16  U.S. 1190 (2005).

17      A petitioner can overcome a procedural default by demonstrating cause and prejudice.

18  <u>Coleman v. Thompson</u>, 501 U.S. 722, 753 (1991).  Here, petitioner alleges that his appellate

19  counsel performed ineffectively, in violation of his constitutional rights, by failing to raise on

20  appeal those issues presented to the state courts for the first time in habeas.  <u>See</u> ECF No. 1 at 7,

21  ECF No. 17 at 5-7.

22      Ineffective assistance of counsel ("IAC") can, if pleaded and proved, establish cause for a

23  default.  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986); <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451

24  (2000).  The cause and prejudice inquiry applicable to Claim One overlaps with the merits of

25  petitioner's appellate IAC claim at Claim Three.  In both the default and merits contexts,

26  petitioner must establish prejudice from appellate counsel's performance, which in turn requires

27  analysis of the strength of the claims that counsel failed to present on appeal.  <u>See Moorman v.</u>

28  <u>Ryan</u>, 628 F.3d 1102, 1106-07 (9th Cir. 2010), <u>cert. denied</u>, 132 S.Ct. 346 (2011).

1    A federal court may bypass consideration of a procedural bar issue in the interests of

2  judicial economy, where the asserted default presents complicated questions and the other issues

3  are resolvable against the petitioner.  Lambrix v. Singletary, 520 U.S. 518, 522−25 (1997);

4  Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  Here, because the merits of the

5  defaulted issues must be evaluated in any case, the court should exercise its discretion to bypass

6  the procedural default issue and rule on the merits of the petition.[6]

7                    B.  Sufficiency Challenge To Gang Enhancements

8                        1.  Allegations and Factual Background

9    Petitioner challenges the sufficiency of the evidence to support the gang enhancements

10  under Cal. Penal Code § 186.22(b).  ECF No. 1 at 4.  Specifically, petitioner alleges that the

11  evidence was inadequate to establish that either the attempted murder or shooting at an occupied

12  vehicle was committed for the benefit of a gang.  Id.  Petitioner's argument appears to be that

13  Detective Schumacher's expert opinion testimony that the offenses were committed for the

14  benefit of a gang was inadequate because it was based solely on petitioner's status as a gang

15  member, and there were no other facts indicating petitioner's actions were gang-related or done

16  with the specific intent to assist, further, or promote criminal conduct by gang members.  See

17  ECF No. 17 at 9; Lodged Doc. No. 9 at 10-11.[7]

18    Detective Schumacher testified as an expert on Hispanic gangs.  II R.T. 409, 421, 423.

19  For three and a half years prior to trial, Schumacher had worked almost exclusively investigating

20  the Norteño and Sureño criminal street gangs and had contact with gang members on a daily

21  basis.  II R.T. 411, 413.  As a result, he was familiar both with gangs and with the "gang criminal

22  lifestyle."  II R.T. 412-13.  According to Schumacher, the primary activities of the Norteño gang

23  include graffiti, auto theft, carjacking, sales of drugs, drive-by shootings, felony assaults, and

24  _____

25  [6]  As will become clear, the superior court followed this course.  Having noted that the
insufficiency of evidence claim was not properly presented, the merits of the claim were

26  nonetheless analyzed in the context of petitioner's ineffective assistance of counsel claim.
Lodged Doc. 10.

27  [7]  Lodged Doc. No. 9 is not internally paginated.  Accordingly, the court has assigned page
numbers.

28

1   murder.  II R.T. 424.  The Norteño gang has been validated as a criminal street gang in other

2   criminal proceedings.[8]  II R.T. 424.  In Schumacher's opinion, both petitioner and Bustos were

3   active members of the Norteño street gang at the time of the incident.[9]  II R.T. 426-27, 443, 447.

4          Schumacher explained that Norteños and Sureños are traditionally enemies and that it is

5   important for Norteños to make sure Sureños respect them.  R.T. 417-19.  Respect is very

6   important to gang members and they "will do many things up to and including violence to protect

7   that respect" or to get it back when they feel like they have lost it.  II R.T. 418.  In the gang

8   world, respect is garnered through fear and intimidation, not by getting good job or being a good

9   parent.  II R.T. 419.  Respect is "almost always" accomplished through violence, such as "fist

10  fight[ing], stabbing, or drive-by shooting."  II R.T. 419.  It is a very violent lifestyle.  II R.T. 419.

11  As Schumacher explained, "The gang culture is basically in a perpetual cycle of one-up-manship.

12  If one person feels like they've been slighted or disrespected[,] they are going to have to either

13  equal or do better when they do their retaliation to . . . get that respect back."  II R.T. 457.  Thus,

14  it is typical for the retaliation to be characterized by an escalation of violence, which increases

15  respect for the gang.  II R.T. 458.

16  _____

17  [8]  Schumacher also provided testimony regarding two murders committed by other members of
    the Norteño gang.  These crimes were introduced as predicate offenses in order to establish the
18  Norteños as a criminal street gang within the meaning of Cal. Penal Code § 186.22(b).  See II
    R.T. 461-64.  Neither of the predicate offenses involved petitioner or Bustos.  II R.T. 464.

19  [9]  Schumacher's opinion was based on his experience and training, as well as various gang-related
    items recovered at petitioner and Bustos' residences. II R.T. 426-27, 443, 446-47.  Schumacher

20  described the items found at petitioner's residence and explained how they were significant to his
    opinion that petitioner was an active gang member.  II R.T. 443-47.  A number of pictures were

21  recovered from petitioner's residence depicting petitioner wearing red, the color associated with
    the Norteño street gang.  II R.T. 400, 405-06, 416; III R.T. 700-09.  Some photographs depicted

22  petitioner wearing a Mongolian hairstyle with the top of his hair divided into four parts, which
    Schumacher explained represents the Norteño gang.  II R.T. 445.  In some pictures, petitioner was

23  making Norteño gang signs with his hands.  II R.T. 446.  Belt buckles with the letter "N" were
    found in petitioner's closet, which Schumacher explained stands for "Norteños."  II R.T. 434,

24  466.  A t-shirt with a "Joker" on the front and a "14 Norte" on the back were also found in
    petitioner's room.  II R.T. 403.  The "14 Norte" is significant because it is the number associated

25  with the Norteño gang.  II R.T. 415, 443.  The "Joker" or clown image is significant because it
    represents the "smile now[,] cry later" mentality associated with street gangs.  II R.T. 444-45.

26  Based on the Elder Creek Road incident, petitioner was validated as a Norteño gang member.  II
    R.T. 447.

27

28

1    Schumacher opined that the shooting at Sim Park, the shooting at petitioner's house, and

2    the shooting on Elder Creek Road, were representative of "classic gang retaliation activity."  II

3    R.T. 459.  As to the drive-by shooting at petitioner's house, Schumacher opined that it was for the

4    benefit of the Sureño gang.  II R.T. 456.  He described it as the "classic drive-by shooting

5    situation," where Sureño gang members "sent a message" by driving by a Norteño gang

6    member's residence and "spray[ing] the house with bullets[,] not caring who they hit."  II R.T.

7    456-57.  Schumacher next opined that the shooting on Elder Creek Road was for the benefit of

8    the Norteño gang and was done in retaliation for the drive-by shooting at petitioner's house.  II

9    R.T. 458-60.  Because the Sureños had done a drive-by shooting on a Norteño gang member's

10   house, the Norteños must retaliate and "answer back" because "they can't let something like that

11   happen without some sort of retaliation."  II R.T. 458-59.  They must "settle the score."  II R.T.

12   459.

13    On cross, Schumacher conceded that if the only facts were that a drive-by shooting

14   occurred at petitioner's house and petitioner's girlfriend was shot, it would not necessarily be a

15   gang act for petitioner and Bustos to follow the shooters in order to identify or stop them.  II R.T.

16   473-74, 514, 583.  However, he clarified that additional facts in the case were significant and

17   contributed to his opinion that petitioner's actions were for the benefit of the Norteño gang.  II

18   R.T. 587.  According to Schumacher, it was significant that the occupants of the van were

19   members of the Sureño gang and the occupants of the white car were members of the Norteño

20   gang.  II R.T. 587.  The fact the individuals in the white car brought a gun when they followed the

21   van and actually shot at the van contributed to his opinion that the incident was gang-related.  II

22   R.T. 587.  He explained that it goes back to the idea of "one-upmanship;" the people in the van

23   shot petitioner's girlfriend and now petitioner and Bustos "feel like they have to get retribution

24   for that." II R.T. 588.  Taking these additional facts into consideration, Schumacher opined that

25   the Elder Creek Road incident was "very much gang related."  II R.T. 588.

26    Petitioner testified that he did not act for the benefit of the gang, but rather out of anger

27   and fear for his own life, as well as that of his girlfriend and baby.  III R.T. 676, 691, 744.

28   According to petitioner, he followed the van to ascertain the identity of the shooters and only shot

10

1    at them in self-defense after they opened fire on him during the chase.  III R.T. 672-76, 692, 736,

2    738-42, 753-54, 775, 789.  On cross, petitioner admitted that he continued following the van even

3    after he had written the license plate number down because he was concerned that the plate

4    number alone "wasn't enough" for the police.  III R.T. 743-45.  When petitioner spoke with law

5    enforcement on the day of the incident, he did not initially give them the license plate number

6    because then they would know that he followed the van.  III R.T. 774.

7         During closing arguments, the district attorney emphasized that petitioner did not

8    accompany his pregnant girlfriend to the hospital when she was shot in the back.  II R.T. 838.

9    Instead, he chased after the van.  III R.T. 838-39.  She argued that petitioner was more concerned

10   with retaliation and "taking care of business on the street" than the safety of his girlfriend and

11   baby, which was consistent with the gang expert's testimony that in the gang world, "gang

12   business" takes priority over family.  III R.T. 838-39.

13                        2.   The Clearly Established Federal Law

14        Due process requires that each essential element of a criminal offense be proven beyond a

15   reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

16   sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

17   the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

18   elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

19   (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

20   the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

21   to that resolution."  Id. at 326; see also Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n. 13 (9th

22   Cir.2005).  In order to grant a writ of habeas corpus under AEDPA, the court must find that the

23   decision of the state court reflected an objectively unreasonable application of Jackson and

24   Winship to the facts of the case.  Juan H., 408 F.3d at 1274.  The federal habeas court determines

25   the sufficiency of the evidence in reference to the substantive elements of the criminal offense as

26   defined by state law.  Jackson, 443 U.S. at 324 n. 16; Chein v. Shumsky, 373 F.3d 978, 983 (9th

27   Cir.2004).

28

1          3.   The State Court's Ruling

2          The Sacramento Superior Court did not address the merits of petitioner's sufficiency

3   challenge directly.  See Lodged Doc. No. 10.  However, it did analyze the merits of the claim as it

4   related to petitioner's ineffective assistance of counsel claim, in which he alleged that his trial and

5   appellate counsel were ineffective for failing to challenge the sufficiency of the evidence

6   supporting the gang enhancements.  Lodged Doc. No. 10 at 1-2.  Thus, the superior court

7   decision, Lodged Doc. No. 10, constitutes the last reasoned decision on the merits of petitioner's

8   claim because the California Court of Appeal summarily denied the petition, Lodged Doc. No.

9   12, and the state supreme court denied discretionary review, Lodged Doc. No. 14.  See Ylst v.

10  Nunnemaker, 501 U.S. 797 (1991).  Accordingly, it forms the basis of this court's AEDPA

11  review for reasonableness.  See 28 U.S.C. § 2254(d).

12         The superior court concluded that the gang enhancements were supported by sufficient

13  evidence, stating as follows:

14              Petitioner has cited his own version of the crime, to which he
                testified at trial.  But, there was another version of events, as
15              described by the gang expert.  The jury apparently believed the
                expert and not petitioner.  The appellate court would not re-evaluate
16              that decision on credibility.  It would not ask whether a different
                version of events could be reasonably believed.  The reviewing
17              court's only question would be whether the crime could reasonably
                be seen as one in which petitioner, who was a gang member,
18              retaliated against members of another gang following their shooting
                at his house.  There is no dispute that these facts were presented and
19              could be supported.

20  Lodged Doc. No. 10 at 2.

21          4.   Objective Reasonableness Under § 28 U.S.C 2254(d)

22         The admissibility of Detective Schumacher's testimony and expert opinion are matters of

23  state law that are not subject to review here.  See Estelle v. Maguire, 502 U.S. 62, 67-68 (1991).

24  The only question under ADEPA is whether the state court reasonably applied Jackson v.

25  Virginia in concluding that the detective's testimony could rationally support findings that the

26  attempted murder and shooting at an occupied vehicle were gang-related within the meaning of

27  ////

28  ////

1   Cal. Penal Code § 186.22(b).[10]

2          The state court could reasonably conclude that Detective Schumacher's testimony

3   supported the necessary jury findings that the incidents were gang-related and intended to benefit

4   the gang.  In rendering his opinion that the offenses were gang-related, Schumacher did not rely

5   solely on petitioner's status as a gang member, as petitioner suggests.  Rather, he considered that

6   the people in the van were rival gang members who had done a drive-by shooting at petitioner's

7   house, that petitioner brought a gun when he followed the van and subsequently shot at the van,

8   and the importance of retaliation in gang culture.  Based on Schumacher's testimony, petitioner's

9   actions, and petitioner's admission that he was more concerned with catching the people in the

10  van than being with his girlfriend, a rational juror could conclude that petitioner was primarily

11  acting in retaliation for the benefit of the gang.

12         Furthermore, petitioner's claim that he followed the van to get the license plate number

13  was undermined by his admission that he continued following the van even after he wrote the

14  plate number down and then did not initially give the plate number to law enforcement.  While

15  petitioner testified that his actions were not gang-related, the jury clearly rejected petitioner's

16  testimony.  This credibility determination is entitled to near total deference under ADEPA.  See

17  Schulp v. Delo, 513 U.S. 298, 330 (1995).  Thus, it simply cannot be said that no rational juror

18  could have found proof beyond a reasonable doubt that the offenses were intended to benefit the

19  gang. On this record, the state court did not unreasonably apply the Jackson standard.

20  Accordingly, habeas relief is unavailable.

21              C.  Sufficiency Challenge To Attempted Murder Conviction

22                   1.  Allegations and Factual Background

23         Petitioner next challenges the sufficiency of the evidence to support his conviction for

24  attempted murder.  ECF No. 1 at 4.  Specifically, petitioner alleges that because he acted in the

25  _____

26  [10]  In order to find the gang enhancement allegations true, the jury had to find (among other
    things) that petitioner "committed the crime for the benefit of or in association with a criminal

27  street gang" and "intended to assist, further, or promote criminal conduct by gang members."  II
    C.T. 353.

28

                                                    13

1  heat of passion, there was insufficient evidence for the jury to find that he acted with the requisite

2  malice necessary to support an attempted murder conviction.  Id.; ECF No. 17 at 8.

3          At trial, the prosecution's theory was that the attempted murder of Rivera-Quintero and

4  Sanchez was primarily gang-motivated.  See I R.T. 16-17.  The prosecution presented evidence

5  that after rival gang members did a drive-by shooting at petitioner's house, petitioner and Bustos

6  followed their van with a loaded gun and subsequently shot at them.  One of the shots hit

7  Sanchez, the passenger in the van, below his armpit.  R.T. 138, 258, 282.  After the van crashed

8  into a pole on Elder Creek Road, petitioner and Bustos drove past the van, stopped, made a "U

9  turn," and pulled up next to the van.  R.T. 164, 194-99, 351, 677.  Petitioner fired additional shots

10  as Sanchez ran away from the van.

11          Detective Schumacher, the prosecution's gang expert, opined that petitioner and Bustos

12  were both active members of the Norteño gang at the time of the incident.  II R.T. 426-27, 443,

13  447-48.  Schumacher testified that in gang culture, gang members retaliate with violence when

14  they feel disrespected.  II R.T. 418-19; R.T. 457.  In order to regain respect, gang members

15  typically retaliate with an equal or greater level of violence than was used against them.  II  R.T.

16  457-60.  Thus, if guns are used in the first incident, it is "very plausible" that the retaliation will

17  also involve gun fire.  II R.T. 458.  In Schumacher's opinion, petitioner followed the van because

18  he had been disrespected by the drive-by shooting and needed to "answer back" by "settl[ing] the

19  score, but [doing] one better."  II  R.T. 457-60.

20          Petitioner testified that when he initially followed the van, he did not intend to shoot its

21  occupants.  III R.T. 744-46.  Although he was mad, petitioner followed the van in order to

22  identify the shooters and get their license plate number.  III R.T. 744.  He testified that "the whole

23  thing was to go stop them" so the police could catch them.  III R.T. 745.  He was concerned about

24  his girlfriend, but knew she would be taken care of because her brother had taken her to the

25  hospital.  R.T. 692-93.  On cross, the prosecutor elicited that petitioner was more concerned with

26  catching the people in the van than taking care of his girlfriend.  R.T. 693-94.  Petitioner

27  maintained that the occupants of the van fired at him first and he only shot back in self-defense.

28  III R.T. 673-76, 736, 738-42, 753-54, 775.

1    The jury was instructed on attempted murder as well as the lesser included offense of

2  attempted voluntary manslaughter under a heat of passion theory.[11]  II C.T. 347-49.  With respect

3  to attempted voluntary manslaughter, the jury was instructed as follows:

> An attempted killing that would otherwise be attempted murder is
> reduced to attempted voluntary manslaughter if the defendants
> attempted to kill someone because of a sudden quarrel in the heat of
> passion.
>
> A defendant attempted to kill someone because of a sudden quarrel
> or in the heat of passion if:
>
> 1.  The defendant took at least one direct but ineffective step
>     toward killing a person;
>
> 2.  The defendant intended to kill that person;
>
> 3.  The defendant attempted the killing because he was provoked;
>
> 4.  The provocation would have caused an ordinary person of
>     average disposition to act rashly and without due deliberation,
>     that is, from passion rather than from judgment;
>
> AND
>
> 5.  The attempted killing was a rash act done under the influence of
>     intense emotion that obscured the defendant's reasoning or
>     judgment.

17  II C.T. 348-49.[12]  The jury was further instructed that the burden was on the prosecution to prove

18  that petitioner did not act in the heat of passion.  Id.

---

[11]  The jury was also instructed on imperfect self-defense and self-defense or defense of another.
II C.T. 353, 362-63.  However, on federal habeas, petitioner argues only that he acted in the heat
of passion.  See ECF No. 1 at 4; ECF No. 17 at 8-9.

[12]  The jury received the following additional instructions regarding the heat of passion theory:

> Heat of passion does not require anger, rage, or any specific
> emotion.  It can be any violent or intense emotion that causes a
> person to act without due deliberation and reflection.
>
> In order for heat of passion to reduce an attempted murder to
> attempted voluntary manslaughter, the defendant must have acted
> under the direct and immediate influence of provocation as I have
> defined it.  While no specific type of provocation is required, slight
> or remote provocation is not sufficient.  Sufficient provocation may
> occur over a short or long period of time.
>
> It is not enough that the defendant was simply provoked.  The

(continued…)

15

In closing, the district attorney argued that petitioner's own testimony was evidence that he did not act in the heat of passion.  III R.T. 842.  According to petitioner, he made the conscious choice to have his girlfriend's brother take her to the hospital while he followed the van in order to get the license plate number to give to police.  III R.T. 842-43.  The district attorney argued that this showed that petitioner was acting rationally and that his sense of reasoning and judgment was not impaired.  III R.T. 843.

### 2.   The Clearly Established Federal Law

The federal law governing this claim is set forth above, in relation to the sufficiency of the gang evidence.  In sum, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. at 319.  The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n. 16; Chein v. Shumsky, 373 F.3d at 983.

### 3.   The State Court's Ruling

The Sacramento Superior Court did not directly rule on the merits of petitioner's

---

defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether an ordinary person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.

If enough time has passed between the provocation and the attempted killing for an ordinary person of average disposition to "cool off" and regain his or her clear reasoning or judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on this basis.

The People have the burden of proving beyond a reasonable doubt that the defendant did not attempt to kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of attempted murder.

II C.T. 348-49.

16

1   challenge to the sufficiency of the evidence supporting his attempted murder conviction.  See

2   Lodged Doc. No. 10.  However, the court addressed the claim as it related to petitioner's

3   ineffective assistance of counsel claim, and found that the malice element was supported by

4   sufficient evidence, stating as follows: "The same is true as to attempted murder.  The jury had

5   enough circumstantial evidence from which to conclude that petitioner intended to kill the

6   occupant of the other car.  The jury was not required to believe petitioner when he said that he did

7   not."  Id. at 2.

8                4.   Objective Reasonableness Under 2254(d)

9         The state court's adjudication of this claim did not involve an unreasonable application of

10   Jackson v. Virginia.  Under state law, "attempted murder requires the specific intent to kill and

11   the commission of a direct but ineffectual act toward accomplishing the intended killing."  People

12   v. Superior Court, 41 Cal.4th 1, 7 (2007).  Petitioner alleges only that there was insufficient

13   evidence for the jury to find that he possessed the intent to kill.  ECF No. 17 at 8.

14         Here, there was ample circumstantial evidence from which the jury could reasonably

15   conclude that petitioner possessed the intent to kill when he fired his gun at the occupants of the

16   van.  Based on petitioner's actions and the gang expert's testimony, the jury could reasonably

17   conclude that petitioner chased after the van in order to "settle the score" and intended to kill its

18   occupants in order to get retribution for the shooting of petitioner's girlfriend.  The evidence

19   showed that the occupants of the van were rival gang members who had just committed a drive-

20   by shooting at petitioner's residence and shot his pregnant girlfriend, and that petitioner chased

21   after the van with a loaded gun, shot at the van, approached the van after it crashed into a pole,

22   and shot at one of the van's occupants as he ran away.  While petitioner presented evidence that

23   he did not intend to kill anyone, the jury was not required to credit his testimony.  Viewing the

24   facts in the light most favorable to the prosecution, a rational juror could find beyond a reasonable

25   doubt that petitioner intended to kill the occupants of the van.

26         Nevertheless, petitioner argues that the intent to kill element was negated because he acted

27   in the heat of passion.  Lodged Doc. No. 9 at 12-13.  Thus, at issue here is whether the attempted

28   murder was a "rash act done under the influence of intense emotion that obscured [petitioner's]

                                                    17

1   reasoning or judgment." <u>See</u> II C.T. 348-49.  Petitioner argues that he was upset and "acted

2   irrationally out of anger" because his pregnant girlfriend had just been shot.  Lodged Doc. No. 9

3   at 12-13.  Petitioner had the opportunity to present this theory at trial, and did so.  However, the

4   jury was not required to believe petitioner's testimony, and his credibility cannot be reevaluated

5   on federal habeas.  <u>See</u> <u>United States v. Delgado</u>, 357 F.3d 1061, 1068 (9th Cir. 2004) ("[T]he

6   credibility of witnesses is a question for the jury, unreviewable on appeal.").

7        Even if the jury had found petitioner credible, it reasonably could have concluded that his

8   testimony did not establish heat of passion.  The jury could have reasoned that if petitioner was

9   thinking clearly enough to decide to follow the van in order to identify the shooters and assist the

10  police, then he was not acting in the absence of reason and deliberation.  Thus, a rational juror

11  could conclude beyond a reasonable doubt that petitioner was not acting in the heat of passion.

12  On this record, it was not objectively unreasonable for the state court to find that petitioner's

13  claim lacked merit.  Accordingly, habeas relief is unavailable.

14       II.    <u>Claim Three: Ineffective Assistance of Counsel</u>

15       In a related claim, petitioner alleges that his constitutional rights were violated because his

16  trial and appellate counsel rendered ineffective assistance.  ECF No. 1 at 5; ECF No. 17 at 10;

17  Lodged Doc. No. 9 at 4-5, 14-15.  Specifically, petitioner contends that trial counsel was

18  ineffective for failing to challenge the sufficiency of evidence in support of his attempted murder

19  conviction and the related gang enhancements, and that appellate counsel was ineffective for

20  failing to raise the issues on direct appeal.  <u>See</u> <u>id.</u>

21       A.    <u>Clearly Established Federal Law</u>

22       To establish a constitutional violation based on ineffective assistance of counsel, a

23  petitioner must show (1) that counsel's representation fell below an objective standard of

24  reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  <u>Strickland v.</u>

25  <u>Washington</u>, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

26  adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

27  errors, the result of the proceeding would have been different.  <u>Id.</u> at 693–94.  The court need not

28  address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

18

1    prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

2    sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

3    The United States Supreme Court has emphasized that "[t]he standards created by Strickland and

4    § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly'

5    so."  Richter, 131 S. Ct. at 788 (internal quotations and citations omitted).  The determination to

6    be made on federal habeas review, therefore, is not whether counsel acted reasonably, but

7    "whether there is any reasonable argument that counsel satisfied Strickland's deferential

8    standard."  Id.

9              B.  The State Court's Ruling

10         The superior court decision, Lodged Doc. No. 10, constitutes the last reasoned decision on

11   the merits of petitioner's claim in this case because the California Court of Appeal summarily

12   denied the petition, Lodged Doc. No. 12, and the state supreme court denied discretionary review,

13   Lodged Doc. No. 14.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991).  Accordingly, it forms the

14   basis of this court's AEDPA review for reasonableness.  See 28 U.S.C. § 2254(d).  Because the

15   state superior court adjudicated the claim in a reasoned opinion, review under § 2254(d) is

16   confined to "the state court's actual reasoning" and "actual analysis."  Frantz, 533 F.3d at 738.

17         The superior court rejected petitioner's ineffective assistance of counsel claim.  The court

18   analyzed the merits of petitioner's sufficiency challenge, and finding the claims meritless, ruled

19   that "[i]t was not ineffective for either trial or appellate counsel to fail to question the sufficiency

20   of the evidence.  Both counsel reasonably recognized that this would not be a winning argument."

21   Lodged Doc. No. 10 at 1-2.

22             C.  Objective Reasonableness Under § 2254(d)

23         The state court did not unreasonably apply the Strickland standard.  The court first

24   determined that petitioner's challenge to the sufficiency of the evidence supporting his attempted

25   murder conviction and the gang enhancements lacked merit.  Lodged Doc. No. 10 at 1-2.  The

26   undersigned likewise finds, as discussed regarding Claim One, that petitioner's sufficiency

27   challenge lacks merit.

28         Based on its determination that petitioner's sufficiency challenge was meritless, the state

                                                    19

1    court concluded that counsel could not be found ineffective for failing to raise the claim.  <u>See</u>

2    Lodged Doc. No. 10 at 2.  Federal law supports the state court's conclusion that counsel cannot

3    be found ineffective for failing to raise a meritless argument.  <u>See</u> <u>Boag v. Raines</u>, 769 F.2d 1341,

4    1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective

5    assistance."); <u>see also</u> <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a

6    futile action can never be deficient performance [.]").  Moreover, because any challenge to the

7    sufficiency of the evidence would have failed, petitioner cannot demonstrate prejudice from

8    counsel's failure to raise the issue.  Accordingly, the state court's rejection of this claim was

9    consistent with, and a reasonable application of, the <u>Strickland</u> standard.  The undersigned

10   accordingly finds that petitioner's ineffective assistance of counsel claim should be denied.

11        III.    <u>Claim Two: Failure to Bifurcate the Gang Enhancements</u>

12        Petitioner contends his due process rights were violated when the trial court denied his

13   motion to bifurcate the trial on the criminal street gang allegations under Cal. Penal Code section

14   186.22(b).  See ECF No. 1 at 4.  He argues that the joint trial of the gang enhancement allegations

15   and the underlying charges "poisoned the jury" and prevented it from considering his claims of

16   self-defense, heat of passion, or imperfect defense of himself or of another.  ECF No. 1 at 4.

17        A.    <u>Factual and Procedural Background</u>

18        Prior to trial, petitioner's co-defendant moved to bifurcate the trial of the gang

19   enhancement allegations from the underlying offenses, and petitioner joined in this motion.  I

20   R.T. 15-16.  Defense counsel argued that petitioner and his co-defendant were not validated gang

21   members at the time of the incident and were not implicated in any crimes involving gang

22   allegations prior to their arrest in the current case.  I. R.T. 16.  Counsel argued that the gang

23   allegations were unduly prejudicial and would "poison the jurors" against the defendants by

24   preventing them from fairly considering the defense that the men followed the van to identify

25   who shot petitioner's girlfriend, and that they shot at the van only in self-defense or defense of

26   others.  I R.T. 15-16.

27        The district attorney argued that there was substantial evidence found at both men's

28   residences to substantiate their validation as Norteño gang members at the time of the incident.

1    She argued that the shooting was primarily "gang motivated" and that it would be unrealistic to

2    bifurcate the primary motivation for the shooting from the trial of the charged offenses.  I R.T.

3    16-17.

4            The trial court denied petitioner's motion, finding that the probative value of the evidence

5    outweighed the prejudicial effect and would not tend to confuse or mislead the jury.  I R.T. 17.

6    At defense counsel's request, the court agreed to give a limiting instruction advising the jury that

7    the gang evidence could not be used to show that petitioner had a criminal disposition.  I R.T. 17-

8    18; II C.T. 355.  The jury was also instructed on the permitted uses of the gang evidence.[13]

9            The relevant gang evidence introduced at the joint trial of the charged offenses and the

10   gang enhancements has been set forth above.

11   _____

[13]  The jury was instructed as follows:

12

13              You may consider the evidence of gang activity for the limited
               purpose of deciding whether:

14              The defendant acted with the intent, purpose, and knowledge that
               are required to prove the gang-related crimes, enhancements, and
15              special circumstances allegation charged;

16              OR

17              The defendant had a motive to commit the crimes charged;

18              OR

19              The defendant actually believed in the need to defend himself;

20              OR

21              The defendant acted in the heat of passion.

22              You may also consider this evidence when you evaluate the
               credibility or believability of a witness and when you consider the
23              facts and information relied on by an expert witness in reaching his
               or her opinion.

24
               You may not rely consider this evidence for any other purpose.
25              You may not conclude from this evidence that the defendant is a
               person of bad character or that he has a disposition to commit
26              crime.

27   II C.T. 357.

28

                                                     21

B.  The State Court's Ruling

This court reviews the opinion of the California Court of Appeal on direct review, which was the last reasoned state court decision on this issue.  See Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).  Because the appellate court adjudicated the claim in a reasoned opinion, review under § 2254(d) is confined to "the state court's actual reasoning" and "actual analysis."  Frantz, 533 F.3d at 738.

The state appellate court analyzed the trial court's denial of petitioner's motion to bifurcate under the governing state law, People v. Hernandez, 33 Cal. 4th 1040 (2004), and ruled as follows:

> Hernandez, cited by defendant at trial, supports the court's ruling, not defendant's position.
>
> In Hernandez, the California Supreme Court determined that a trial court did not abuse its discretion in denying the defendant's motion to bifurcate the gang enhancement charges from the underlying charges of robbery. Noting that a trial court has the discretion to bifurcate certain issues such as prior convictions from the determination of the defendant's guilt of the charged offense (Hernandez, supra, 33 Cal.4th at pp. 1046, 1048, 1051), Hernandez distinguished the prior convictions (which relate to the defendant's status and are often not connected to the instant crime) from the criminal street gang enhancement allegations (which, by definition, are inextricably linked to the defendant's crime). (Ibid.) On this latter point, Hernandez explained: "Evidence of the defendant's gang affiliation-including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like-can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (Id. at p. 1049.) Bifurcation is thus warranted only when the other evidence of the predicate acts required to establish the gang enhancement is unduly prejudicial, or when the gang evidence about the defendant is "so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (Ibid.)
>
> Drawing from cases discussing the standard for severance of charged offenses, Hernandez stated, "when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.] When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise

be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.'" (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

Here, applying the deferential abuse of discretion standard of review (*Hernandez, supra,* 33 Cal.4th at pp. 1050-1051), we find no abuse of discretion.

Lodged Doc. 6 at 7-8.

The court of appeal then distinguished petitioner's situation from that of the defendant in

People v. Albarran, 149 Cal.App.4th 214 (2007), where the defendant alleged that the failure to

bifurcate the trial of the gang enhancement allegations violated his constitutional due process

rights:

This is not a case like the one in [*Albarran*], upon which defendant relies. In that case, there was a total absence of evidence that the charged shooting was gang related. In other words, there was insufficient evidence to sustain the gang enhancements. (*Id.* at pp. 217, 227-228.) Rather than showing motive and intent, the gang evidence served only to inflame the jury and show the defendant's dangerous and criminal disposition. (*Id.* at p. 230.)

Here, the evidence in support of the enhancement was ample, and defendant does not challenge its sufficiency on appeal. More importantly, the evidence was not introduced to show defendant had a criminal disposition. Rather, it was relevant to his motive in committing the attempted murders. The evidence about his gang involvement and related activities shed light on his claim that those in the van shot at him first and he merely returned fire in self-defense. (*People v. Martin* (1994) 23 Cal.App.4th 76, 81-82.) There was no reasonable way to have bifurcated the enhancement allegations, as doing so would have deprived the prosecution of its theory of defendant's motive for committing the underlying offense. Cases have repeatedly upheld the introduction of gang affiliation and activity where, as here, such evidence is relevant to an issue of motive or intent. (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518, and cases cited therein.)

Furthermore, the trial court dispelled the potential for prejudice by instructing the jury that "[g]ang evidence is not admissible and the jury will not consider it solely to show that the defendants are persons of bad character or have a disposition to commit crimes." The court also instructed the jury: "You may consider evidence of gang activity only for the limited purpose of deciding if the defendant acted with the intent, purpose and knowledge that are required to prove the gang[-]related crimes and enhancement and special circumstances allegation charged. [¶] Or the defendant had a

23

1    motive to commit the crimes charged. [¶] Or the defendant actually
     believed in the need to defend himself or the defendant acted in the
2    heat of passion. [¶] You may also consider this evidence when you
     evaluate the credibility or believability of a witness and when you
3    consider the facts and information relied on by [an] expert witness[
     ] in making his or her opinion. [¶] You may not consider this
4    evidence for any other purpose. You may not conclude from this
     evidence that the defendant ... is a person of bad character or that he
5    has a disposition to commit crime."

6    The court did not abuse its discretion in denying defendant's
     motion to bifurcate the trial of the gang enhancement.

7

8    Lodged Doc. No. 6 at 8-10.

9         C.  Objective Reasonableness Under § 2254(d)

10        To the extent petitioner alleges that the trial court erred in refusing to bifurcate the gang

11   enhancement as a matter of state law, this court is bound by the determination of the state

12   appellate court. See, e.g., Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's

13   interpretation of state law, including one announced on direct appeal of the challenged conviction,

14   binds a federal court sitting in habeas corpus."); Hicks v. Feiock, 485 U.S. 624, 629-30 (1988)

15   (state appellate court's determination of state law is binding and must be given deference).

16   Accordingly, the constitutional issue before this court is solely whether the joint trial of the gang

17   enhancements and the underlying offenses deprived petitioner of his right to a fair trial.

18        The undersigned finds that the failure to bifurcate the trial on the gang enhancements did

19   not rise to the level of a due process violation. "The simultaneous trial of more than one offense

20   must actually render [a habeas] petitioner's state trial fundamentally unfair and hence, violative of

21   due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate." Featherstone v.

22   Estelle, 948 F.2d 1497, 1503 (9th Cir.1991). "The requisite level of prejudice is reached only 'if

23   the impermissible joinder had a substantial and injurious effect or influence in determining the

24   jury's verdict.'" Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2003) (internal citations

25   omitted). "In evaluating prejudice, the [federal habeas court] focuses particularly on cross-

26   admissibility of evidence and the danger of 'spillover' from one charge to another, especially

27   where one charge or set of charges is weaker than another." Id. "[T]he risk of undue prejudice is

28   particularly great whenever joinder of counts allows evidence of other crimes to be introduced in

24

1   a trial where the evidence would be otherwise inadmissible." Sandoval v. Calderon, 241 F.3d

2   765, 772 (9th Cir. 2000).  The danger in these situations is that the jury may find it difficult "to

3   compartmentalize the damaging information." Id.

4         Here, the failure to bifurcate the gang enhancement did not render petitioner's trial

5   fundamentally unfair.  Petitioner contends that his trial was unfair because the gang evidence was

6   not relevant to the charges of shooting at an occupied vehicle and attempted murder.  However,

7   because the prosecutor's theory was that the crimes were primarily gang-motivated, the gang

8   evidence was relevant to, and admissible to prove, motive and intent.  As the state court

9   recognized, the gang evidence also gave context to petitioner's claim that he acted in self-defense,

10  imperfect self-defense, or in the heat of passion.  Thus, contrary to petitioner's assertions, the

11  gang evidence was relevant to issues bearing on petitioner's guilt of the underlying crimes and

12  was not introduced simply to show that petitioner was a person of bad character or had a criminal

13  disposition.

14        With respect to the risk of impermissible spillover between the charges, "any possible

15  prejudice [resulting from the joint trial of the gang enhancements and the underlying offenses]

16  was ameliorated by the trial court's instructions on the limited use of the [gang] evidence." See

17  Davis, 384 F.3d at 639 (no due process violation where "the jurors were expressly warned not to

18  use the gang evidence for any other purpose or to conclude that petitioner was a person of bad

19  character or that he had a disposition to commit crime").  Here, the jury was specifically

20  instructed that the gang evidence could be considered only for determining petitioner's intent,

21  purpose, and knowledge; whether petitioner had a motive to commit the crimes; whether

22  petitioner actually believed in the need to defend himself; whether petitioner acted in the heat of

23  passion; and to evaluate the credibility of witnesses.  II C.T. 357.  The jury was further instructed

24  that the gang evidence could not be used to conclude that petitioner was a person of bad character

25  or had a disposition to commit crime.  II C.T. 355, 357.  It is presumed that the jurors followed

26  these instructions. Francis v. Franklin, 471 U.S. 307, 324 n. 9 (1985) (the Supreme Court

27  "presumes that jurors, conscious of the gravity of their task, attend closely [to] the particular

28  language of the trial court's instructions in a criminal case and strive to understand, make sense

1     of, and follow the instructions given to them").

2            Petitioner further alleges that his trial was fundamentally unfair because the evidence

3     regarding his gang membership inflamed the jury and prevented it from considering his claim that

4     he acted in self-defense, imperfect self-defense, or in the heat of passion.  ECF No. 1 at 4.

5     Petitioner argues that the testimony regarding two murders committed by other members of the

6     Norteño gang was particularly inflammatory.  Lodged Doc. No. 3 at 31.  Here, petitioner has

7     failed to demonstrate that the jury was actually inflamed.  See Park v. California, 202 F.3d 1146,

8     1150 (9th Cir. 2000) ("In order to demonstrate actual unfairness . . . [petitioner] must show that

9     the jury was actually inflamed.").  The jury was specifically instructed that it could consider the

10    gang evidence in assessing whether petitioner acted in self-defense or in the heat of passion.  II

11    C.T. 357.  Unfortunately for petitioner, the main evidence supporting his claim of self-defense or

12    heat of passion was his own trial testimony, which the jury clearly rejected.  The jury's rejection

13    of petitioner's testimony does not establish that the evidence of petitioner's gang membership

14    inflamed the jury against him or rendered his trial was unfair, particularly in light of petitioner's

15    credibility problems at trial.[14]

16           Petitioner has likewise failed to establish that the testimony regarding the two murders

17    committed by other Norteño gang members prejudicially inflamed the jury against him.  These

18    crimes were introduced solely as predicate offenses to establish the Norteños as a criminal street

19    gang within the meaning of Cal. Penal Code § 186.22(b), and the record reveals that the district

20    attorney made clear that neither petitioner nor his co-defendant were involved in either crime.

21    See II R.T. 461-64.  Thus, it is unlikely that the jury convicted petitioner of attempted murder in

22    order to punish him for the prior murders committed by other Norteño gang members.  It is also

23

24    [14] Petitioner testified that he had previously lied to law enforcement when he was interviewed
      about the current case.  III R.T. 685-86.  On cross-examination, he admitted that he lied under
25    oath in front of the jury in order to avoid "sound[ing] like a maniac."  III R.T. 723-24.  During
      closing arguments, the district attorney reminded the jury that petitioner was an admitted liar:
26    "[Petitioner] essentially admitted while he was still under oath that he lied under oath.  So he
      admitted committing perjury on the stand . . . He admitted a lie repeatedly to police officers.
27    Does he have any problem sitting on that stand and lying to you?  No."  III R.T. 818.

28

1  significant that the jury convicted petitioner of the attempted murder of Rivera-Quintero and

2  Sanchez, but not the attempted murder of Luis Martinez.  The jury's failure to convict petitioner

3  on all counts suggests the jury was able to compartmentalize the evidence and was not acting out

4  of passion.  See Park, 202 F.3d at 1150 (9th Cir. 2000) ("[T]he failure of the jury to convict on all

5  counts is the best evidence of the jury's ability to compartmentalize the evidence.") (internal

6  quotations and citations omitted).   Accordingly, petitioner has not established that the admission

7  of the gang evidence rendered his trial on the underlying offenses fundamentally unfair.

8          For all these reasons, it was not objectively unreasonable for the state court to conclude

9  that the trial court's failure to bifurcate the gang enhancements from the trial of the underlying

10  offenses did not "so infect[] the entire trial that the resulting conviction violated due process."

11  Accordingly, relief must be denied on this claim.

12      IV.    Conclusion

13          For all the reasons set forth above, IT IS RECOMMENDED that petitioner's application

14  for federal habeas corpus be denied.

15          These findings and recommendations are submitted to the United States District Judge

16  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

17  after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

20  he shall also address whether a certificate of appealability should issue and, if so, why and as to

21  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

22  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.  §

23  2253(c)(3).   Any response to the objections shall be filed and served within fourteen days after

24  service of the objections.  The parties are advised that failure to file objections within the

25  ////

26  ////

27  ////

28  ////

specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

F.2d 1153 (9th Cir. 1991).

DATED: November 12, 2014

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE